## BEEGLE v. THOMSON.

### No. 8334.

Circuit Court of Appeals, Seventh Circuit.

Nov. 6, 1943.

Rehearing Denied Dec. 28, 1943.

See, also, 2 F.R.D. 82.

Wilfred S. Stone, Louis A. Bisson and Stone, Artman & Bisson, all of Chicago, Ill., for appellant.

Harry Frease and Joseph Frease, both of Canton, Ohio, Emrys G. Francis, of Sharon, Pa., and Harry W. Lindsey, Jr., and Charles L. Howard, both of Chicago, Ill., for appellees.

Before MAJOR and KERNER, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Plaintiff questions the propriety of a judgment two-fold in character. Its complaint consisted of five counts, the first of which charged that Sharon Steel Company, as manufacturer and vendor, and Thomson, trustee for the Chicago & North Western Ry. Company, as user, had infringed Claims 1, 2, 3 and 4 of patent to Beegle, 1,737,908, covering a timber anchor iron, designed to prevent or retard splitting and checking of the timber in which it is placed. The other counts charged only the Steel Company; the second averring breach of an assumed contract not to infringe; the third, unfair competition; the fourth and fifth, injury to plaintiff arising from defendant's alleged violation of the Anti-Trust Act 15 U.S.C.A. §§ 2, 18 and 20.

A trial of the first two counts upon the merits resulted in the court finding, as to the first, non-infringement of the claims sued on and, if they be infringed, invalidity; and as to the second, failure of proof upon plaintiff's part. After a pre-trial conference as to the issues arising on Counts 3, 4 and 5, the court granted defendant's motion for summary judgment thereon and dismissed the complaint. Plaintiff now asserts that the court erred in each of the findings and in the entry of judgment.

From 1923 to 1928, Beegle was a workman engaged in driving tie irons into the ends of railroad ties, piled in stacks, awaiting seasoning and subsequent use in railroad tracks. Green ties tend, as they season, to dry near the perimeter first and in this process frequently check and split. Tie irons are driven into the ends to control or retard this action and are utilized also, after ties are in place in road beds, to prevent further rupture. The problem of counteracting these tendencies and preventing resulting deficiencies is concerned with phenomena occurring in heavy pieces of timber in the course of seasoning, stresses arising in their interior structures during that period, the various natural characteristics and tendencies of differently cut ties, (some being squared quarters or less portions of logs and some entire squared logs, depending upon the dimensions of the raw timber), and their action and performance under heavy train burdens and when subjected to the impact of large spikes driven into them to fix the rails. Railroad and equipment industries have, in the course of years, developed and utilized many varieties of irons, those finally employed being mostly in the shape of an S or a C and consisting of comparatively thin strips of steel with one edge beveled so as to be driven relatively easily into the ends of ties.

Beegle, working as a practical artisan, claims to have observed various deficiencies in the irons in prevailing use, namely,

(1) an S or C iron does not prevent damage if a split passes across one of the curved parts of the iron, for that part tends to sever a portion of the tie,—the very thing it is intended to prevent; (2) curved ends of such an iron do not provide as efficient anchorage as irons of comparatively straight lines with triangular arms and right angled terminals, forming L-hooks, though the latter use less steel and, therefore, cost less; (3) S and C irons can not be reshaped by the workman, as is sometimes desirable in practice; and, (4) frequently they do not extend over or span the lines down which a split may result from driving a spike in the rail.

Convinced of these deficiencies, as he says, he devised an iron of the preferred design mentioned in 2 above, and procured a patent thereon. In his application he said that his invention related to "improvements in timber anchors," and especially to anchors "adapted to prevent checking and splitting of railway ties * * * with a view to preventing spike splitting, vertical checking and season checks usually existing in cross-ties and other timbers." Obviously he did not limit his device to one adapted to be used on ties, but claimed it for anchorage or tying functions in any or all timber. Claim 1, typical, is as follows: "A timber anchor having substantially the outline of an open—side polygon, one side of which constitutes a substantially straight body portion, an anchor face at each end thereof, constituting adjacent sides of the polygon, and each carrying a relatively short, inwardly directed terminal; said faces being shorter than said body portion and projecting therefrom at an obtuse angle, the body portion, faces and terminals of said anchor being adapted in use, to co-act to define and clamp an unbroken unit of timber." By his prescribed construction, he built on his iron, terminals "substantially L-shaped," teaching that thereby "the holding power * * * is increased greatly out of proportion to the amount of metal added to form this additional terminal member." In each claim he included this essential element, describing it in Claim 2 thus: "Each arm carrying an inwardly directed angular member, constituting the terminals of said anchor." Each of his illustrative figures shows this angular hook-like terminal.

Various patented timber anchor or tying devices appear in the prior art. Starr, 547,093, made one of crinkled sheet metal, the rounded angular curves serving to prevent two joining members from separating. Similar were the structures of Walker, 300,536 and Rasner, 515,168. Williams, 1,201,008 and 1,208,255 suggested irons with outwardly and inwardly extending projections, which tended to prevent joined materials from pulling apart. Fiebig, 1,436,584, described a straight line angular tying iron, lacking, however, the L-terminals of Beegle. Sayre, 180,070, taught the use of a similar, straight line, angular tying iron for wood, such as the corners of a picture frame, but he, too, failed to add Beegle's L-terminal members. Other prior art workers made various pertinent suggestions.

It is apparent, therefore, that Beegle was no pioneer and, by broadly asserting an invention of an anchor device, he traveled beyond railroad tie irons into the field of similar tying devices for reinforcing joints or preventing rupture of other timber and charged himself with all he could perceive there. His claims were allowed only after amendment to show the "angular" terminal, or an "angulate member at the end of each face" or "an inwardly directed primary terminal at an extremity of said anchor." Evidently only because of the inclusion of this specified element, did the patent office impute invention to him. In view of the status of the art, Beegle's improvement was narrow in scope, indeed, and his claims must be limited to the precise thing he claimed. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736; Barrel Fitting & Seal Corp. v. American Flange & Mfg. Co., 7 Cir., 74 F.2d 569.

Did defendants infringe? Beegle's teaching, as disclosed by his description and specification of terminals formed in right angles or near right angles, provided an improved anchor, resisting the withdrawing force of the timber, not found in other devices. His underlying thought was that the anchor arms and members, when formed in such angles, provided a tying, holding power necessary to overcome the tendency of timber to pull apart. Defendants' device includes no tying members or terminals of right angle form. It is made entirely of crinkled sheet metal and the thought underlying its construction is that the crinkles, creases or waves of the metal will furnish efficient anchorage power to overcome the tendency of the timber to spread. The only angular members are

the two arms which form angles with the main body. These lack the L-hooked terminals. It seems to us that the two conceptions are far apart in their proposed solutions of the problem. Beegle, if he achieved invention over the prior art, did so because of the exact form which he specified. Consequently, his claims must be limited to that specified construction. On the other hand, defendants more clearly adhere to the prior art and avoid the very elements which, it seems to us, led to Beegle's grant. We think the District Court correctly held that they have not infringed. We think that the patented device and the one accused are far from being identical or equivalent to each other, in structure, design, operation or principle. Rather they represent different approaches to and different methods of solution of the problem confronting the railroad tie-iron art.

As to Count 2, admitting for the purpose of this disposition, that defendant Steel Company is bound by the contract, agreeing "to observe and respect" the patent and not infringe it, defendant still has a right to show that it has not broken that contract, by demonstrating that nothing it has done constitutes infringement and that what it has produced is not that, or the equivalent of that which it has recognized as valid. We think the correct principles here are those controlling where a patentee has licensed another to make the patented device, concerning which, in Sinko Tool & Mfg. Co. v. Casco Products Corporation, 7 Cir., 89 F.2d 916, 917, we said that "the license raises no estoppel against the licensee in respect to the noninclusive type of his product. * * * It does not estop him in any way from making devices which are not within the class licensed, for as to such products the licensee takes nothing by the license, no immunity from suit and assumes no obligation respecting same." International Burr Corp. v. Wood Grinding Service, 2 Cir., 34 F.2d 905. Inasmuch as defendant's device did not infringe, there is no breach of contract. Defendant never agreed to refrain from manufacturing noninfringing devices.

Count 3, in Paragraphs 14 (a), (b), (c) and (d), charges defendant with unfair competition. An essential premise for the liability sought to be enforced in this count is plaintiff's averment that defendant has offered for sale and sold a type of iron of the same general outline as plaintiff's and "an unquestionable infringement of plaintiff's patent" and, in doing so, has, in various manners, been guilty of unfair competition. If this essential averment, upon which all other parts of the pleading rest in order to bring about liability, were eliminated, nothing would remain stating in any wise any cause of action against defendant. The court had tried the question of infringement and the trial had resulted in a finding that defendant did not infringe. The device which defendant sold was, as the court found and as we agree, not a "Beegle type" iron, as averred, not of the same general appearance as Beegle's iron and not an infringement of Beegle's patent. It was, as we have pointed out, rather a development of the prior art, more nearly following its teaching than that of Beegle, whose invention, we have seen, must be given the narrow scope of his actual specification. With this essential averment decided upon the merits against plaintiff, there remains nothing in these paragraphs to create a liability.

In Paragraph 14(e) of Count 3, plaintiff charges that defendant "maliciously interfered" with the contractual relationship between plaintiff and Sharon Supply Company. This conclusion is based ultimately upon averments of fact, one essential element of which is that the Supply Company was infringing and that the Steel Company knew this and took over the assets and liabilities of the Supply Company in order to circumvent a covenant of the latter not to infringe. But to create liability upon this hypothesis, it was necessary for plaintiff to aver and prove further that the circumvention was successfully achieved,—in other words, that the Steel Company did in fact proceed to infringe. But the proof in this respect failed. Hence plaintiff could take nothing by virtue of this paragraph.

Furthermore the court found as a fact in the trial of Count 2, where the same issue was presented, that the Steel Company had no knowledge of any alleged infringement by the Supply Company and did not assume any of the liabilities of the latter. An examination of the evidence is convincing that it amply sustains the finding. It follows that the court had before it nothing to support a finding for plaintiff on this paragraph.

Paragraph 14 (f) of Count 3 avers that the Steel Company is "using the amount of tonnage which it ships on the

railroads as a means of selling anti-splitting irons" and thereby has achieved commercial success. This is said to be unfair competition, yet absent are all averments that anything defendant did was of unlawful character or of facts constituting wrongful action upon defendant's part. If plaintiff hoped to succeed, it behooved it to state sufficient facts to constitute a valid cause of action. This it failed to do.

■ In Count 4 plaintiff charges violation of the Anti-Trust Act, 15 U.S.C.A., Section 20, Par. 2, averring specifically that defendant "by using its large volume of freight haul as a club to coerce purchases of anti-splitting irons from itself, in an amount in excess of $50,000.00 a year, has compelled the Pennsylvania Railroad to purchase irons exclusively from the defendant, * * * without open bidding on each other" and that thereby plaintiff has been deprived from receiving the business of the Pennsylvania Railroad Company. Under Section 20* Congress forbids a railroad from purchasing, without open bidding, maintenance goods of a value in excess of $50,000 from any corporation having upon its Board of Directors or as an officer, manager or agent, any person who is at the same time a similar director, manager, officer, or agent of the railroad company. The statute creates no liability unless such an interlocking director or agency relationship exists. Inasmuch as plaintiff made no averment of such relationship, the count was deficient as a statement of a cause of action and the court properly entered judgment thereon in favor of defendant.

■ Plaintiff urges that the second paragraph of Section 20, which fixes criminal responsibility for violation of the Act, creates also a cause of action, if open bidding is prevented, irrespective of whether an interlocking relationship exists. We think this construction unjustified. Statutory remedial causes of action must find express basis in congressional act; they do not arise by implication from a provision for a criminal penalty.

■ In Count 5 plaintiff charged defendant with violation of Sections 15 and 18, 15 U.S.C.A. in that, prior to the fall of 1936, defendant was in competition with Sharon Railway Supply Company in the sale of anti-splitting irons; that it then acquired all the stock of the Supply Company and dissolved that corporation, so that competition was lessened and even eliminated, whereby plaintiff "is given a cause of action." By amendment plaintiff averred, in addition, that defendant "is attempting to monopolize and" has done a great deal toward monopolizing the anti-splitting iron business of the United States. The court found, not only as to this count but upon the merits as to Count 2, where the issue was squarely presented, that the relationship between the Steel Company and the Supply Company was not that of competitors; that the evidence established, beyond peradventure, that there was in fact no competition between the Steel Company and the Supply Company; that defendant manufactured no tie irons prior to the purchase of the Supply Company and that, eventually, the Steel Company purchased from the Supply Company its assets but assumed none of its liabilities, with a resulting loss of capital investment to the stockholders of the Supply Company, which was then in failing condition. The evidence before the court, produced by the plaintiff itself, could reasonably lead to no other finding and the court properly, therefore, rather than enter into a long extended trial where plaintiff would be unable to prove one of its essential averments, en-

---

* "§ 20. No common carrier engaged in commerce shall have any dealings in securities, supplies, or other articles of commerce, or shall make or have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm, partnership, or association when the said common carrier shall have upon its board of directors or as its president, manager, or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership, or association, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission. No bid shall be received unless the name and address of the bidder or the names and addresses of the officers, directors, and general managers thereof, if the bidder be a corporation, or of the members, if it be a partnership or firm, be given with the bid."

tered summary judgment. Abouaf v. J. D. & A. B. Spreckels Co., D.C., 26 F.Supp. 830.

■ Furthermore, as we pointed out in American Press Ass'n v. United States, 7 Cir., 245 F. 91, a firm closing out its business because of financial difficulties may sell its plant even to a competitor without violating the Anti-Trust Law. See also International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431.

■ However, the District Court need not have proceeded so far in justification of its action in dismissing this count. Section 15, allowing private parties treble damages for injury accruing to their business from violation of the Anti-Trust Act, embraces, as one of the essentials to such action, injury to plaintiff's business. The complaint must affirmatively show this injury. It is not enough to allege something forbidden and claim damages resulting therefrom. Allegation of the specific injury suffered by plaintiff differing from that sustained by it as a member of the community is essential. The manner, nature, character and extent of the injury sustained and the facts from which injury accrues and upon which damages may be assessed as well as those with regard to the effect of the alleged violation upon plaintiff's business, must be pleaded. The mere existence of a violation is not sufficient ipso facto to support the action, for no party may properly seek to secure something from another without allegation and proof of facts demonstrating pecuniary loss springing from or consequent upon the unlawful act. American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047; Keogh v. Chicago, etc., R. Co., 7 Cir., 271 F. 444, affirmed 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183; Jack v. Armour & Co., 8 Cir., 291 F. 741; Twin Ports Oil Co. v. Pure Oil Co., 8 Cir., 119 F.2d 747, certiorari denied 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 516; Westmoreland Asbestos Co. v. Johns-Manville Corp., D.C., 30 F.Supp. 389, 32 F.Supp. 731; Locker v. American Tob. Co., 2 Cir., 218 F. 447; American, etc., Co. v. O'Halloran, 2 Cir., 229 F. 77; Leonard v. Socony-Vacuum Oil Co., D.C., 42 F.Supp. 369; Louisiana Farmers' Protective Union v. Great Atlantic & Pacific Tea Co., D.C., 40 F.Supp. 897. Inasmuch as the count embraced no such essential averments the court properly entered judgment dismissing it.

Nor does the bill of particulars remedy this lack of averment, for it, too, is singularly lacking in recital of any facts sufficient to sustain an averment of injury to plaintiff's business.

The judgment is affirmed.