**KUESTER et al. v. HOFFMAN et al.**
**(HOFFMAN SPECIALTY CO.,**
**Inc., Intervener).**

**No. 8846.**

Circuit Court of Appeals, Seventh Circuit.

Dec. 20, 1945.

S. L. Wheeler, of Milwaukee, Wis., for appellants.

Nelson Littell, of New York City, and David A. Fox, of Milwaukee, Wis., for appellees.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

Plaintiffs charged defendants with infringement of claims 1 and 2 of their United States Patent No. 2,152,699, issued to them April 4, 1939, on their application of October 8, 1934. The defense was noninfringement and invalidity. The court found the facts specially, and that the claims were valid but not infringed. It concluded as a matter of law that the claims were not infringed, and decreed accordingly on December 29, 1944. It made no conclusion of law, nor did it decree, as to validity. From this decree notice of appeal was filed March 27, 1945.

The invention relates to improvements in heating or cooling processes and systems, and claim 2[1] is the only one relied upon here.

One object of the invention is to provide a heating system in which heat disseminating means is separated from a source of high heat, and the temperature in the radiator system is separated from the source of high heat and is modulated at intervals, as required, by the establishment of circulation between the radiator system and the source.

The other object is to provide a heating system wherein a circulating and radiating system is provided with means for maintaining a forced, and substantially constant circulation therein of heated fluid, in

---

[1] Claim 2. "In a heating system provided with radiators and a circulating system for fluid passing through said radiators, a source of fluid at extreme temperature, a valve and pipe connections for establishing fluid connection whereby to include and exclude said storage tank within said circulatory system, means for moving said valve in a complete cycle of movement from closed to open position and back to closed position, and a thermostat for controlling said valve operating means, said thermostat being connected with a source of electric current and appropriate electrical connections to said valve operating means, whereby to intermittently initiate said cycle of operations."

combination with a storage tank or other source of heated fluid at a relatively extremely high temperature, and means whereby the storage tank or supply is normally divorced from the circulating and radiating system, but is connected with it by means of a by-pass controlled by a valve which may interconnect the circulating and radiating system and the storage tank, whereby to supply to the radiating and circulating system a charge of hot water from the storage tank to modify the temperature of the fluid in the circulating system.

The ordinary and well known heating system includes a source of hot water, a supply main to the radiator and a return line from the latter to the source. The patent modifies such system in the following respects, although all the elements are quite old in the art. It provides a by-pass from the return to the supply line without passing through the boiler; it divorces the boiler from the circulatory system by providing a normally closed control valve by which the boiler is connected to the system at intervals; it provides a power driven circulating pump in continuous operation for circulating the water of the system, inclusive or exclusive of the boiler, as determined by the control valve; and it controls the intervals of opening of such valve, independently of the heat demand in the space to be heated, by so organizing the thermostatic control of the valve that upon each opening of it, the thermostat will temporarily be subjected to an artificially high heat which results in the closing of the valve regardless of the temperature of the air in the space to be heated.

By thus assuring the closing of the control valve, regardless of room temperature, time is given for the "slug of hot water" to produce its effect in the space to be heated without a continuation of hot water from the boiler into the circulating water. If that "slug of boiler water" is adequate to satisfy the heat demand of the space to be heated, the valve will not reopen; if not adequate, after the artificial heat environment has been dissipated, the thermostat will again open the control valve to admit another "slug of hot water" to the system. It is said the system thus automatically tests the demand after an equalizing interval following each "slug of hot water." However, the "slug" cannot be stopped or decreased after the valve starts to open, until it opens completely and closes again.

Under the patent the water is normally circulated by the pump through the pipes to and through the radiators and through the return pipes back to the pump. When the temperature in the room in which the thermostat is located falls below the point at which the thermostat is set, an element of the latter moves to the left and contacts the wire which energizes the motor connected to the control valve, which in turn causes the crank arm and plunger of that valve to move the valve plug so as to close the port which shuts off circulation through the by-pass and permits circulation through the storage tank, thus introducing water at extreme temperature into the circulating circuit for a predetermined period. The control valve is adjustable, hence the time consumed in one opening and closing of it is variable, dependent upon such preadjustment. Mr. Kuester testified that at one time he had observed it through several operations, when it opened and closed in forty seconds. He further stated: "I should say about fifty per cent of the time there would be * * * yes more than that * * * a commingling of the hot and cold joining because of the opening and rising and closing of the valve, and only very briefly would the hot water exclusively be admitted to the system."

At the time when the thermostatic element contacts the wire which energizes the motor to the control valve, there is a resistance or heating element within the thermostat casing which becomes energized, thus generating heat inside the thermostat casing which causes the thermostatic contact element to shift from the motor energizing the wire to its opposite contact, thus establishing a circuit which moves the crank arm of the motor in the opposite direction, and closes the port of the control valve, thus permitting circulation through the by-pass but not through the storage tank. Thermostats of this type are admitted to be old in the art.

It is clear that in the operation of the patent, the control valve which admits hot water from the tank immediately reverses itself, when fully opened, to cut off the flow of hot water from the tank. The valve automatically opens about once in every four minutes, and automatically opens and closes in about forty seconds. Even though the system calls for heat, the valve continues to thus open and close until the heat requirements of the system are satisfied. However, when the valve has opened

and closed once, it cannot reopen until the heating element in the thermostat has cooled to below the room temperature, which requires two to three minutes.

In the accused device, the supply of heated water for the radiating circuit is controlled by an outdoor temperature bulb and the water temperature bulb located in the supply main to the radiator circuit. These bulbs are connected to a temperature controller so constructed as to call for a different temperature of water going to the radiator circuit as the outside temperature varies. For each outside temperature, water at a definite temperature must be circulated through the radiator circuit to offset the heat losses from the building, and the temperature controller is designed to vary this temperature of the circulating water in accordance with the heat requirements demanded by variations of the outdoor temperature.

In actual operation, the addition of hot water to the radiator circuit is controlled by a rocker arm which rests upon the top of the plungers of two bellows connected respectively with the outdoor and the water temperature bulbs, and controls the operation of the switch which in turn controls the opening and closing of the control valve.

The control valve consists of a heat motor having a casing on the inside of which is an accordion type bellows which operates on the top of the valve stem connected to the control valve. The valve is normally closed by the coil spring in the bottom, which presses the valve upward on its seat. When the switch in the control box is closed, it makes an electric circuit through the resistance wires which are wound around the top of the projection on the casing in which the accordion shaped bellows is mounted. Inside this casing is a volatile fluid. When the heat imparted to the resistance wires by the closing of the switch vaporizes enough of the fluid, a pressure is exerted on the top of the bellows which causes it to press downward on the top of the valve to open the valve.

The control valve remains open until the heat requirements of the system are satisfied either by the expansion of the bellows connected to the bulb in the water temperature line or by the rise in the outside temperature. When the heat conditions of the system are satisfied, the rocker is lifted from the switch by the expansion of one or both of the bellows, and current to the resistance wires in the heat motor is cut off, after which it takes two or three minutes for the fluid in the heat motor to cool down and condense sufficiently to permit the control valve to close. It requires about one minute to vaporize enough fluid to start the heat motor on its downward journey. After the valve has started to open, it takes about three and one-half minutes to open it completely. It requires a minimum of about seven minutes for the valve to go through a complete cycle of operation from closed to fully open and back to closed position, assuming that the switch is opened immediately after the control valve has reached its full open position, a condition which seldom happens in actual use.

On control valves used on pipe sizes of three inches or larger a reversing motor is used which takes four minutes to open and four minutes to close, assuming that it starts to close immediately after it is opened. The average cycle of this valve is approximately twelve to fifteen minutes.

In the accused device, the recirculated water is never completely cut off but recirculation is going on at all times through the by-pass which contains the Hoffman orifice. When the control valve is fully opened, the amount of water which is recirculated is one-half the amount of hot water being introduced from the boiler, and when the control valve is partially open, the amount of recirculated water going through the by-pass may be as large or larger than the amount of water going through the boiler. In the patented device, when the valve is at the top of its stroke, recirculation of water through the radiator circuit is completely cut off, and only water at extreme temperature from the boiler circuit is introduced into the system. Thus, in the accused device, the water temperature bulb is not immediately subjected to a full blast of hot water, for when the control valve is just beginning to open under the influence of its slow operating heat motor, only a small amount of water will pass through the control valve to force hot water out of the boiler, while a large amount of water will continue to pass through the by-pass and be mixed with a small amount of hot water from the boiler. When the switch is once closed it remains closed until the heat requirements of the system are satisfied, and the control valve continues to open and let in more and more hot water which is mixed with the recirculated water until, when the control valve

is fully open, the amount of hot water is twice the amount of recirculated water. When the amount of hot water added to the system and mixed with the water recirculating through the by-pass is sufficient to bring the water temperature up to the water temperature requirements for the prevailing outside temperature, the water temperature bulb will have caused the bellows connected to it to expand sufficiently to lift the rocker arm off the switch, which then disconnects the current to the heat motor in the control valve, permits the fluid in this motor to condense, and permits the control valve to close. This is a gradual operation, and it would be impossible for the control valve of the accused device to go immediately from closed to open position and back again.

When this patent was before the Patent Office there were nine claims and the Examiner rejected all of them, as involving no invention over the patent to Burke, No. 1,257,801, a German patent to Kraftanlagen Akt. Ges., No. 549,679, and the patents to Hajek, No. 1,997,559, and Shivers, No. 1,985,216. Plaintiffs appealed to the Board of Appeals and withdrew claims 3 and 8. The Board of Appeals affirmed the Examiner's rejection of claims 2 and 6, and no further appeal was taken. The applicants thereby acquiesced in the rejection of claims 2, 3, 6 and 8 as being unpatentable over the prior art. The Board of Appeals allowed claims 1, 4, 5, 7 and 9, and claim 4 became claim 2 which is now before us. The Board noted that the prior art patents cited to the Examiner did not show the admission of predetermined quantities or "slugs" of high temperature water to the radiator system. The Board said in its opinion:

"After careful examination of the citations, we do not find applicants' particular combination of features to be anticipated in that it does not appear that the citations disclose mechanism that would definitely act to admit predetermined quantities of extreme temperature fluid. So far as noted, the citations only partially open or close a switching valve to supply extreme temperature fluid.

"It is our view that claims 1, 4, 5, 7 and 9 may be allowed. The claims of this group include means for in some way feeding definitely controlled quantities or as termed in the record, 'slugs' of extreme temperature of fluid to the system, or particular details of the mechanism.

"We regard claims 2 and 6 of such terms as to fail to avoid the citations applied by the examiner, particularly Burke and hold these claims not allowable."

Other pertinent prior art patents, not cited by the Patent Office, support the ruling of the Board of Appeals. See Stuart, No. 427,634; Evans, No. 471,351; Bolze, No. 971,966; Gibson, No. 1,045,831; Rosenblad, No. 1,993,685.

 The ruling of the Board of Patent Appeals places a very narrow limitation upon plaintiffs' disclosure. It was done to avoid the prior art, and plaintiffs will not now be permitted to broaden their disclosure to include defendants' device which follows the prior art, rather than the patent in suit. See Beegle v. Thomson, 7 Cir., 138 F.2d 875; Thomas v. Simmons Co., 7 Cir., 126 F.2d 743. To permit this to be done would be to render the patent invalid.

Decree affirmed.