**NATIONAL WRESTLING ALLIANCE,**
**Appellant,**

v.

**Harold C. MYERS, Appellee.**

**P. L. GEORGE, Appellant,**

v.

**Harold C. MYERS, Appellee.**

**Nos. 17046, 17047.**

United States Court of Appeals
Eighth Circuit.

Dec. 19, 1963.

---

Harry N. Soffer, St. Louis, Mo., made argument for appellant National Wrestling Alliance and John E. Dunsford, St. Louis, Mo., was with him on the brief. George E. O'Malley, Des Moines, Iowa, entered his appearance in this Court for appellant P. L. George and although not filing a brief concurred in the brief of the appellant National Wrestling Alliance.

Harold C. Myers was submitted on brief by attorneys James G. McDowell, Jr., Henry J. Haugan, Des Moines, Iowa; Arthur C. Hedberg, Jr., Des Moines, Iowa, and Maurice Pope, St. Joseph, Mo., for appellee.

Before JOHNSEN, Chief Judge, and MATTHES and RIDGE, Circuit Judges.

RIDGE, Circuit Judge.

These appeals are from a judgment, triple the total amount of a jury verdict finding that appellee "suffered damages in loss of earnings as a wrestler in the amount of $45,000.00" and "loss of profits as a promoter in the amount of $5,000.00, or a total of $50,000.00," because of appellants' alleged violations of Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 & 2).[1]

There are two facets to this Clayton Act (15 U.S.C.A. § 15) claim:

(1) That appellee has been thwarted in his business of promoting wrestling matches in the State of Iowa because of monopoly and conspiracy to monopolize by appellants;

and

(2) He has been damaged in his "profession as a wrestler because (appellant) George has been instrumental in and responsible for some of the other members of the Alliance failing to use him in their wrestling matches, although (he) did not have work"; which "caused damage to his income and affected his future earning capacity," as a wrestler.

To bring this action within the Clayton Act, supra, appellee alleged—that appellant George and the National Wrestling Alliance have monopolized and have conspired to create a monopoly of "all professional wrestling and the exclusive use of the talents of every wrestler of any prominence in professional wrestling —within the continental limits of the United States," in violation of the antitrust laws, supra. "That as a part of the business" of appellants as bookers and promoters of wrestling matches:

"(T)hey make a substantial utilization of the channels of interstate trade and commerce to negotiate (a) contracts with wrestlers, advertising agencies, seconds, referees, announcers, and other personnel living

---

1. In Case No. 17,046, the National Wrestling Alliance (hereinafter called the Alliance) has duly perfected its appeal and the parties filed briefs and appeared at oral argument. In Case No. 17,047, appellant George, though perfecting his appeal therein, has not filed brief in support thereof. His counsel merely informed the Clerk of this Court, by letter, that "he rests his appeal on the brief and argument as made by counsel for the Alliance." In the 10-page answer brief filed by appellee in Case No. 17,046, he does not undertake to meet the specific assignments of error as made and presented by the Alliance. His brief is of no aid to us in our consideration of this appeal. This is a case where the proof of facts is so formless, indefinite and vague, that it is most difficult to determine whether there is much more than a scintilla of evidence appearing in the record to support either facet of appellee's Clayton Act claim. Hence this appeal is presented to us much as "bramble bush" with counsel for appellant the Alliance, alone, pointing a pathway through it.

in states other than those in which the (appellants) reside; (b) lease suitable arenas and arrange other details for wrestling contests, particularly when the contests are held in states other than those in which the promoters reside; sell tickets to contests across the state lines; (d) negotiate for the sale of and sell rights to make and distribute motion pictures or wrestling contests to the 18,000 theatres in the United States; (e) negotiate for the sale of and sell rights to broadcast and telecast wrestling contests to homes through more than three thousand radio stations in the United States; and (f) negotiate for the sale of and sell rights to telecast wrestling exhibitions to some two hundred motion picture theatres in various states of the United States for display by large-screen television." [2]

In his complaint appellee also alleged that "several years ago each town or city of any size had a local promoter who would lease arenas, arrange for the publicity and contact individual wrestlers to appear on his program. Gradually, in the larger cities the promoters, by reason of the fact that they had more wrestling matches and used more talent, they came to be used as a kind of clearing house by individual small promoters when they desired to obtain wrestling talent." That "gradually the big city promoters desired to be paid a fee for their services —and formed the (Alliance) for the purpose of further integrating the wrestling field and allotted to each of the members certain territory or districts within the continental limits of the United States within which they (the individual promoters) were to have exclusive rights and privileges to the fees obtained from the furnishing of wrestling talent. That gradually it became such that the wrestling promoters who had been assigned told the small promoters who were within their territory, that the small promoter could not contact personally or arrange individually for the talent of any wrestler who wrestled for any of the members of the (Alliance) and informed the wrestlers that they had to do as they were told and go where they were told and not to wrestle for anyone unless the same was approved by the member having exclusive rights in that district or territory, and if they disobeyed these orders they would have no place to wrestle and earn a livelihood." As a consequence, appellee alleged, "it is absolutely impossible for a person *out of favor with any single promoter* to have any freedom of contract or to earn a livelihood and no local promoter can (promote wrestling matches or) book individually and directly" with professional wrestlers. (Emphasis added.) Though the latter allegation sounds of "blacklisting" this case was not tried or submitted to the jury on such theory.

What the evidence adduced at the trial of this case established, stated as favorably to the verdict of the jury as possible, was—appellee had been a wrestler of some prominence for approximately thirteen years. During the summer of 1953 he purchased a carnival at St. Joseph, Missouri, and proceeded to book that carnival at various county fairs through Northern Missouri and Southern Iowa. In the course of said booking he decided to stage wrestling matches between himself and certain others who wrestled for members of the Alliance. He negotiated with some of those wrestlers for their appearance on wrestling cards which he intended to exhibit at the county fair held at Avoca, Iowa, that year. Before the

2. By the above-quoted allegations it is obvious appellee has undertaken to bring this Clayton Act claim within the purview of United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L. Ed. 290 (1955), for the same are a literal, if not wholly verbatim, copy of the allegations made in that cited case. But from the record in the case at bar it is obvious that there is a great disparity between the proof of the facts here established and those shown to exist in International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959). One will search the record of this case in vain to find even a scintilla of evidence to substantiate the above allegations.

time set for such performance, appellee received a telephone call from appellant George. The substance thereof was an inquiry, "why (appellee) was trying to book wrestling matches in Iowa" without consulting George. Appellee testified: "George told him he could not book wrestling matches in Iowa without taking the booking thereof up with him," George. As a consequence, appellant had several telephone conversations with one Sam Muchnick, a promoter of wrestling in St. Louis, Missouri, who was then President of the Alliance. In the course thereof, Muchnick told appellee he had talked with George and George said it would be all right for him to go ahead and promote the wrestling matches as he had planned, if he would pay George the usual booking fee for so doing. Appellee agreed to and proceeded to exhibit wrestling matches at the county fair held at Avoca, Iowa, in the year 1953.

 During the fall and winter of 1953–1954, appellee and George again had a conversation wherein appellee asserts George agreed to allow him to stage wrestling matches at county fairs in Southern Iowa in 1954, if he, George, received a booking fee, as in the previous year. Pursuant to that agreement, appellee undertook to book wrestling matches to be held at county fairs at Avoca and Clarinda, Iowa, in 1954, and entered into contracts therefor with the members of those county fair boards. Before the date set for the wrestling match to be held at Avoca that year, appellant George notified appellee that he was not going to authorize the matches; that he, George, had given notice to the wrestlers

appellee had booked that they could not wrestle with the appellee acting both as a promoter and a wrestler at the same exhibition; and if they did so he, George, would see that they never wrestled again for any member of the Alliance. When appellee was so notified by George he asserts he was also told the only way the matches could go on in Iowa would be that he, George, would promote such matches, take all the profits therefrom and would pay appellee for his work just like any of the other wrestlers, and he, appellee, could never again promote any wrestling in the State of Iowa; it all had to come through George or not at all; and for his insubordination he would see that appellee was hurt all over the country as a wrestler.[3] As a consequence, appellee says, he succumbed to George's demands that year and George took over the promotion of wrestling matches booked by appellee in Iowa during the year 1954. Appellee testified that at the time George did so, George told him in the presence of the members of the State Fair Board with whom he had a contract to promote such bouts, that "the National Wrestling Alliance gave me (George) the State of Iowa to book and promote" and "you Fair Board members, whenever you want wrestling at your fairs or any fair in Iowa—you don't want to go to anybody but me because—I am the man who promotes in Iowa, and nobody else."[4] Thereafter, appellee did not undertake to promote wrestling matches in the State of Iowa, or elsewhere. He has never been licensed as a promoter of wrestling in any state where such business activity is controlled by statute.

3. We pass over testimony appearing in the record of a feudal character between appellee and appellant George, because we consider such matter not substantive to the issue of monopoly, or conspiracy to monopolize, as here charged, but only occurrences that might be considered by a jury in weighing the testimony of the principal witnesses at the trial of this case.

4. The general rule as to the admission of evidence in conspiracy cases is to require first proof of a prima facie case of con-

spiracy, before the acts and declaration of a co-conspirator, made in the absence of a defendant, are admitted. The trial court may, however, exercise its discretion in permitting such evidence to be admitted out of order. Cf. Cyc.Fed. Pro. § 26.358, § 26.359; § 41.117. Also, we note that the testimony of a witness as to what a deceased co-conspirator told him during the progress of the conspiracy, is admissible, in the sound discretion of the trial court. Delaney v. United States, 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462 (1924).

Iowa does not have such a law. Such is the background that gave rise to the Clayton Act claim appellee here makes as to his promotion of wrestling matches.

Other facts established the Alliance to be a non-profit corporation organized under the laws of Iowa. (Chap. 504, Iowa Code, Anno.) Its membership is composed of persons who are local promoters and bookers of wrestling matches, operating individually in different states. Its charter, in accordance with the laws of the state of its incorporation, provides:

> "The affairs of (the) corporation shall be conducted by a Board of Directors who shall consist of not less than three (3) persons and not more than ten (10) persons, * * * * * * All management and affairs of the corporation shall be conducted solely and alone by the Board of Directors * * *." [5]

Meetings of the membership and Board of Directors of the corporation are held annually. Such annual meeting is the only assemblage of the Alliance or its Board of Directors. There is not a scintilla of evidence in the record of this case which tends to prove that the Alliance, *qua* a corporation, has ever negotiated or entered into any contract, engaged in any business activity whatsoever; or that the Board of Directors of that corporation has delegated any of its power or authority to any agent or officer, or inferentially ratified any act on the part of such persons. All that appears in this record, besides its charter, is that the Alliance membership is composed of promoters, who individually promote wrestling matches in the Midwest, who aid one another to get talent; and who "try not to hurt each other" in their individual promotion of wrestling matches, and "that's what the National Wrestling Alliance is." However, a reasonable inference to be made from the evidence

is that some individual members of the Alliance have worked together to prevent the promotion of wrestling matches in the local territory of a fellow Alliance member; and at least two promoters who were members of the Alliance did, individually, act in concert with appellant George, so as to prevent appellee from promoting wrestling matches in Iowa in 1953 and 1954; and because of such conduct certain wrestlers and a referee engaged by appellee did not appear at the 1954 wrestling matches booked by him at the county fair held in Avoca that year. But from the random, confused and indefinite proof appearing in the record before us, it is obscure and uncertain as to how appellee claims the Alliance *qua* a corporation fits into that factual picture as a "monopolist".

Hence the first contention made by the Alliance in this appeal is that the record before us is devoid of any evidence, direct or circumstantial, to establish the existence of monopoly power, *pro se*, on its part to prevent the promotion of wrestling matches in Iowa or anywhere else as here claimed by appellee. As to that matter, it is the Alliance's contention that what was here established by appellee can, at the very most, only be considered as proof of monopoly power intrinsic in the business as conducted by some individual members of the Alliance.

To prove "monopolization" in this private antitrust action under appellee's theory of claim, he assumed the obligation to show (1) that both of the appellants possessed monopoly power, and (2) that they both undertook some course of action as a consequence of that power to exclude competition, or prevent competition, in the business of promoting wrestling matches in the State of Iowa, "the relevant market," (United States v. International Boxing Club of N. Y., 150 F. Supp. 397 (S.D.N.Y.) aff'd 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270) and that such

---

5. Such limitation under Iowa law requires that officers and board of directors act as a unit, and not individually, for and on behalf of the corporate entity, and a single officer cannot, contractually, bind the corporation. See: Ney v. Eastern Iowa Telephone Co., 162 Iowa 525, 144 N.W. 383; Sargent & Co. v. Heggen, 195 Iowa 361, 190 N.W. 506.

action was undertaken by them *pro se,* with a purpose or intent to accomplish that end. Cf. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); United States v. United Shoe Machinery Corp. (D.C.Mass. 1953), 110 F.Supp. 295, aff'd per curiam 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

■■ "Monopoly power is the power to * * * exclude competition." United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Whether an individual or a sole business in a particular field has monopoly power depends upon the particular facts establishing the nature of the business one is engaged in, and the "use of means" in the operation of such business "which made it impossible for other persons to engage in fair competition," (United States v. E. I. Du Pont De Nemours & Co., 351 U.S. at 390, 76 S.Ct. at 1004, 100 L.Ed. 1264) or which has the consequence of excluding competitors from a relevant market. Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L. Ed. 683 (1918). The essentials of monopolization under Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2) are the power to eliminate competition at will, or to reasonably restrain competition, and the intent to exercise that power. United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 592, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Hence the existence of "power" to exclude competition when one desires to do so is the *sine qua non* of a "monopolist".

■■ Whatever may be the precise definition of monopoly, the issue as to existence of monopoly power is whether it is resident in a person (natural or corporate) by reason of the nature and business in which that person is engaged to exclude competition; or whether the existence of such power is otherwise acquired, as by way of conspiracy. One who joins in a business endeavor by way of conspiracy or agreement, express or implied, to exclude competition acquires such power; but when he does so it is as a consequence of the conspiracy. If one party alone is possessed of such power, and the evidence establishes that another party could be possessed thereof only because of the existence of conspiracy, it is essential that such facts be properly submitted to and determined by the trier of facts, before it can be said as a matter of law one is possessed of "monopoly power."

The trial court's charge as given to the jury in this Clayton Act case, except for cautionary parts thereof, was stated in abstract legal terms.[6] By one such declaration, duly objected to by the Alliance, the jury was told:

"In this case either or both of the defendants have monopolized, within the meaning of the antitrust laws, if:

"(1) either of them knowingly and willfully have obtained or maintain the power either to remove, or exclude or keep out, competitors from the field of competition; and

"(2) the defendant or defendants possess the necessary powers; and

"(3) the defendant or defendants have the purpose and intent to exercise the power to remove or exclude.

"In this case both the defendants have monopolized, within the meaning of the antitrust laws, if:

"(1) they have knowingly and willfully combined or conspired either to obtain or to maintain the power either to remove, or to exclude or keep out, competitors from the field of competition; and

"(2) they possess the necessary power; and

"(3) they have the purpose and intent to exercise their power to remove or exclude."

The jury by its verdict as returned in this case did not make any findings of fact as to the alternative issues so sub-

6. We doubt the propriety of abstract instructions in an action under Sections 1 and 2 of the Sherman Act, or the Clayton Act, supra.

mitted to it, as above defined. All that it did was to make a finding that appellee "suffered damages in loss of earnings as a wrestler" and "suffered damages in loss of profits as a promoter" in the amounts first hereinabove stated, but not from what cause or which issue of monopoly power that was submitted to it as above.

We can find no proof in the record of this case from which the jury could reasonably find that the Alliance, *qua* a corporation, *pro se* had "the power either to remove or to exclude or keep out, competitors from the field of competition" because of the business in which it was engaged, nor that it inherently "possessed" any such "power" as submitted to the jury in the first alternative part of the foregoing instruction. We think there was some evidence adduced on the issue of monopoly power from which the jury could reasonably have found that the Alliance might have possessed such power as a consequence of conspiracy. Its membership was composed of "wrestling promoters" and "exhibitors" who apparently joined hands and associated together in protection and facilitation of their respective business. It appears that they jointly and severally recognize the other as a designated booker or promoter in an exclusive territory; that there was a tacit agreement among them not to engage in the promotion or exhibition of wrestling matches in another member's territory as a consequence of their membership in the Alliance; and that they individually otherwise attempted to restrict or limit the promotion or booking of wrestling exhibitions only by members of the Alliance; so as to warrant the giving of the latter alternative part of the above instruction relating to conspiracy.

Be that as it may, counsel for the Alliance specifically objected to the above instruction on the ground that the same was too broad, "in fact broader than the pleadings" and that there was no evidence in the record of this case to warrant the submission of the issue of monopolization *pro se* on the part of the Alliance, as set forth in the first alternative thereof. We can only concur in that matter. Had the trial court in such instruction limited his charge to the jury to the latter part thereof, pertaining to a combination or conspiracy to monopolize, we think that such would have been the only possible and proper issue for consideration by the jury under the particular facts of this case.

But since the trial court did not do so, the judgment in this case must be reversed, for the reason that there is no evidence here of monopoly power, *pro se*, resident in the appellant, the Alliance, to warrant the giving of the first alternative contained in the above instruction. Cf. Volasco Products Company v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 390 (6 Cir. 1962).

We recognize, it is ancient in the law that an action under Sections 1–7 of the Antitrust Acts (15 U.S.C.A. §§ 1–18), though being one premised on a combination or an agreement to restrain interstate trade or commerce, may be prosecuted against one or several, acting in concert. Cf. Kansas City Star Co. v. United States, 240 F.2d 643 (8 Cir. 1957), cert. den. 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438; United States v. General Motors Corp., 121 F. 2d 376 (7 Cir. 1941); City of Atlanta v. Chattanooga F. & P. Works, 127 F. 23, 26 (CCA 6, 1903). But that does not mean that we should affirm the judgment here appealed from, even against appellant George, in the light of what we consider manifest error appearing in this record as above stated. On the record before us, we cannot say what issue was resolved by the jury to reach the verdict it returned. Hence, we think this case must be returned *in toto* to the District Court for another trial.

That being so, it is only proper for us to point out that the evidence adduced in this case established that appellant George "possibly" made $300.00 by his promotion of the Avoca wrestling card in 1953. Other evidence is that from an $800.00 guarantee paid by the County Fair Board for the promotion of the wrestling match at Avoca in 1954,

George—after paying expenses of the wrestlers, including appellee who appeared on that card, the referees, ring rental and transportation—netted a booking fee of $60.00. George, through his promotion of the Clarinda match that year, netted $56.00. There is no dispute as to that matter, and such is all the fiscal evidence in the record in this case from which the jury could possibly have been given any guide as to the possible income which might or could have been earned by appellee from the promotion of wrestling matches in Southern Iowa, or anywhere else, during the critical years in question, or in the future, but for the conspiracy and monopoly here charged.

As to appellee's claim for loss of earnings in his profession as a wrestler because of alleged conspiracy between appellants. It is premised on a claim:

> "That in addition to refusing to allow the plaintiff to promote any wrestling in the State of Iowa, the defendant, P. L. George, has been instrumental in and responsible for *some* of the other members of the Alliance failing to use the plaintiff in their matches, although the plaintiff did not have work. * * * "
> (Emphasis added.)

Both before and after the Iowa incidents above related, the evidence is that appellee wrestled for some members of the National Wrestling Alliance, including the appellant George. Before and after that time he also wrestled for other bookers and promoters who were not members of the Alliance. During the period 1952–1954, he wrestled in Chicago for a booker-promoter who was a member of the Alliance. When then in Chicago, he sometimes wrestled before TV. After the Iowa incidents occurred which he asserts prevented him from promoting wrestling exhibitions in Iowa in 1954, appellee returned to Chicago where he again wrestled on some national television programs, "maybe two or three times," under booking by the same promoter who was a member of the Alliance. For some reason, unrevealed in the record, his services as a wrestler were terminated by that Chicago booker in late 1954. An inference to be gleaned from the evidence is that such termination was brought about because the sponsors of the television show, or the broadcasting companies, ceased televising wrestling matches from the arenas in Chicago.

It is appellee's testimony that after he was released by his Chicago booker and promoter he then went to the Kansas City-St. Joseph, Missouri territory and thereafter began wrestling for a promoter who was a member of the Alliance in Tennessee. His testimony is that he wrestled some 175–180 times out of Nashville, Tennessee, from 1955 through 1961, and in the main for bookers holding membership in the Alliance, including appellant George. Solely because these were what he terms minor engagements in the "gasoline league" he claims his net earnings were depreciated during that period.

To establish appellee's loss of earnings as a wrestler, his counsel short-cuts argument before us by stating in his brief:

> "After leaving Chicago in 1954 plaintiff's annual earnings dropped drastically and never, even up to trial in 1962, approached the point they had developed in 1953. See Appendix No. 3 of Appellant's Brief."

Appendix No. 3, attached to appellant's brief, reveals that appellee proved his "Aggregate Net Income for five-year periods 1950–54" to be "$12,793.01" and from "1955–60 (excluding 1957) $16,528.07"; or an

"Average net income per year
 for all years reported ......$3,265.02
Average net income per year
 prior to 1955 (sic) ........$2,558.60
Average net income per year
 subsequent to 1954 ........$3,853.69."

(Appellee wrestled in Japan in 1957.) Such is the posture of the evidence in the case at bar upon which appellee

premises his claim of damages for loss of earnings as a "wrestler" because of appellants' alleged violations of the Sherman Act, supra. His net income after 1954 seemingly was greater than before.

In the light of the foregoing, we consider applicable law to the factual situation here developed to be as stated in the recent opinion of this Court, in Duff v. Kansas City Star Company, et al., 299 F.2d 320 (8 Cir. 1962), as follows:

"Injury to 'business or property' is essential to the maintenance of an action for damages under the Clayton Act." (299 F.2d l. c. 322.)

And in Siegfried v. Kansas City Star Company, et al., 298 F.2d 1 (8 Cir. 1962), cert. den. 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785, where it is said:

"There must be some evidentiary basis to support an inference as to loss of net profits"

in such cases * * *

"A damage verdict may not be based upon speculation and guesswork alone." (298 F.2d l. c. 7.)

Proof esssential to recovery of damages in antitrust litigation has been the subject matter of many Clayton Act claims, as revealed by authorities cited in the Siegfried and Duff opinions, supra. The rule thereby established may be summed up thus: The fact of damages, as well as the amount thereof, is entirely a question of sufficiency of evidence. In every case, the question is whether the data of which the evidence consists is such that a just and reasonable inference and estimate thereof can reasonably be drawn from the evidence so that a verdict will not be based on mere speculation or guesswork. The usual common law standards are to be applied in establishing the fact, as well as the extent of the injury in such cases. However, it is fully recognized in Clayton Act litigation that the requirements of certainty of damages are applied more liberally in favor of the plaintiff than is usual at common law; and the "tendency of the courts is to find some way in which damages can be awarded where a wrong has been done." Nevertheless, a plaintiff in such actions may not recover compensatory damages for loss of prospective profits based on mere speculation, surmise and conjecture. Blaski v. Inland Steel Co., 271 F.2d 853 (7 Cir. 1959); Flintkote Company v. Lysfjord, 246 F.2d 368 (9 Cir. 1957); Peller v. International Boxing Club, Inc., 227 F.2d 593 (7 Cir. 1955); Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9 Cir. 1955); Beegle v. Thompson, 138 F.2d 875 (7 Cir. 1943) cert. den. 322 U.S. 743, 64 S.Ct. 1143, 88 L.Ed. 1576; Northwestern Oil Co. v. Socony-Vacuum Oil Co., Inc., 138 F.2d 967 (7 Cir. 1943) cert. den. 1944, 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081; Baush Mach. Tool Co. v. Aluminum Co. of America, 79 F.2d 217 (2 Cir. 1935). However, excessiveness or inadequacy of verdicts is not a question for consideration by this Court. Twentieth Century-Fox Film Corp. v. Brookside Theatre, 194 F.2d 846; but we may consider whether there is a basis in fact for the allowance of any damage. Siegfried, etc., et al. v. Kansas City Star Co., et al., supra.

We do not deem it necessary to write upon other assignments of error as here made by the Alliance, than as above determined. They probably will not occur at a retrial of this case.

Reversed and remanded.

JOHNSEN, Chief Judge (concurring).

For purposes of § 2 of the Sherman Act, 15 U.S.C.A. § 2, the term "monopoly" is antithetic to the term "competition". On this basis, it is perhaps possible to contend that only one engaged in business in the field involved, either actually or representatively, so as to have a competitive interest therein, can become a monopolist.[1] The effect of this would be that one not thus engaged, so that the object of eliminating competi-

---

1. I intend no intimation that I regard such a restrictive concept of the Act as sound.

tion as to his situation is not involved, could be subject to the operation of § 2 only on the basis of his having participated in a conspiracy with someone in the business (other persons also might be involved, of course) to help bring about such a monopoly in the field.

Here, as the majority opinion points out, the National Wrestling Alliance was not entitively engaged in the business of booking, promoting or exhibiting wrestling matches. Looking, however, at what I believe the evidence would have permitted it to be found that the nature and purpose of the Alliance really were —a group of bookers, promoters and exhibitors joining together for control and protection; the association not being intended to have any corporate functions as such; and the object of membership being to make their underlying agreement or understanding work—I am not certain but that the Alliance could be regarded as representatively having a competitive interest and a monopoly power as to the wrestling game.

I do not deem it necessary, however, to deal further with this question. There was a lack of focus upon any definite theory on which the Alliance was contended to be a monopolist, so that no intelligible basis was afforded for the Court to submit the question generally and have the jury pass upon it in that manner. On the abstractness of the evidence and the instructions, I agree that the judgment is entitled to be reversed, for the Court's general submission of the issue.

As to the question of conspiracy to monopolize, the majority opinion recognizes that the Court had a right to submit that issue as it did, and I shall therefore not engage in any further discussion of it.

I concur also in a reversal as to the question of damages, on the ground that the verdict did not respond to the probative aspects and realities of the evidence. The question here is not one of dealing with excessiveness as such, but with the jury's ignoring of the tangible limitations of the situation.

What was involved was Myers' alleged loss of earnings as a wrestler and profits as a promoter. As to the latter item, if it stood alone, I should not hesitate too much on whether the $5,000.00 allowed could be said to have some semblance of rational basis on his testimony. On the loss of earnings as a wrestler, however, I am unable to see any semblance of rational basis in his testimony for the $45,000.00 allowed.

From Myers' own figures, what the situation got down to was not that his earnings had actually diminished, but that he had had to work harder and longer to keep up the amount. On the "gasoline circuit", with its cheaper and more numerous matches, to which he claimed it was necessary for him to resort because of things done against him, he had to engage in more frequent matches and greater travel in order to keep up his earnings.

He could be allowed damages for the difference in earnings from the kind of matches in which he previously was able to engage and earnings from the kind in which he thereafter had to engage. That difference, however, was not entitled to be viewed on the basis of the greater number of matches in which he was able to and did engage on the "gasoline circuit", but only on the basis of the number of matches in which he could and would have engaged in the territory from which he claimed to have been excluded. On this basis, I am unable to see how the jury could objectively come forth with a verdict of $45,000.-00 as earnings lost.